IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
APR 3 0 2010
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

```
                              )
AUDREY CLEMENT, et. al.       )
                              )
          Plaintiffs,         )
                              )
v.                            )    Civil Action No. 01:09-cv-1056
                              )
RAY LAHOOD, Secretary of the  )
United States Department of   )
Transportation, et. al.       )
                              )
          Defendants.         )
_____)
```

## MEMORANDUM OPINION

This matter comes before the Court on Cross Motions for
Summary Judgment.

Plaintiffs, residents of Arlington, Virginia, bring this
suit against Federal Defendants Ray LaHood, Secretary of the
United States Department of Transportation, Victor Mendez,
Administrator of the Federal Highway Administration (FHWA),
Roberto Fonseco-Martinez, FHWA Virginia Division Administrator,
and David S. Ekern, Commissioner of the Virginia Department of
Transportation (VDOT). They challenge the FHWA's August 1, 2008
approval of a Categorical Exclusion (CE) for the construction of
a Spot Improvement Project (Project) to relieve traffic
congestion in the westbound lanes of Interstate 66 (I-66) in
Arlington and Fairfax Counties in Virginia.

Plaintiffs seek declaratory judgment pursuant to 28 U.S.C. § 2201 that the FHWA's approval of the I-66 Project is unlawful and invalid, and seeks injunctive relief pursuant to 28 U.S.C. § 1651 prohibiting FHWA from providing financial assistance for the Project and prohibiting VDOT and its contractors from contracting for, commencing, or continuing construction of the Project, unless and until such time as FHWA has complied with all the requirements of National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Federal-Aid Highway Act (FAHA), 23 U.S.C. § 101 *et seq.*

The Federal Bureau of Public Roads (now the FHWA) approved the 9.6-mile segment of I-66 from Rosslyn to the Beltway in 1959. Disagreements, negotiations, coordination with the Metro system, and litigation delayed implementation through the 1960s. Congress passed NEPA in 1969 and Section 4(f) of the Department of Transportation Act, 89 Pub. L. 670, 80 Stat. 931 (Section 4(f)), in 1966. In 1971, the Arlington Coalition of Transportation (ACT) filed suit to stop construction of that segment of I-66. The Court upheld the U.S. Department of Transportation's (USDOT) decision, ACT v. Volpe, 332 F. Supp. 1218 (E.D. Va. 1971), but the United States Court of Appeals for the Fourth Circuit overturned the decision. The Fourth Circuit held that NEPA, Section 4(f), and the revised 23 U.S.C. § 128(a) (1972) meeting requirements applied to the I-66 project because

2

the I-66 project had not reached "the point of completion beyond which" the statues would not apply retroactively. ACT v. Volpe, 458 F.2d 1323, -32, -34, -38.

After reviewing the decision, studying the "transportation, environmental, social, economic and legal considerations," and other legal requirements such as Section 4(f), Secretary of Transportation William Coleman issued his decision on January 5, 1977 (the Coleman Decision). The Coleman Decision approved of spending federal dollars to build the I-66 corridor subject to various conditions and restrictions, such as providing right-of-way in the median for Metro, High Occupancy Vehicle (HOV) restrictions, and, at issue here, "[n]ot construct[ing] any highway lanes in the I-66 right-of-way beyond the four which I am now approving;. . . ." Nevertheless, from the "four-lane divided, limited access highway," the Coleman Decision specifically excepted "acceleration or deceleration lanes at interchange locations. . . ."

Soon after Secretary Coleman made his decision, a new citizens' group sued the USDOT over the Coleman Decision to stop construction of I-66. See D.C. Fed'n of Civic Ass'n v. Adams, 571 F.2d 1310, 1312 (4th Cir. 1978). The Fourth Circuit affirmed, ruling that the Coleman Decision conformed to NEPA and the National Historic Preservation Act, 16 U.S.C. § 470(f) (1978), and that appellate decision allowed the construction of

3

I-66 to continue.

In the Fiscal Year 1999 USDOT appropriation act, Congress removed the Coleman Decision's funding restrictions to give Virginia autonomy to determine the high-occupancy vehicle restrictions on I-66. Act of Oct. 21, 1998, § 361, Pub. L. 105-277, 112 Stat. 2681-477. In the Fiscal Year 2000 appropriations act for USDOT, Congress removed restrictions on Virginia's authority to use federal funds to "operat[e] maint[ain], and construct[] . . . Interstate Route 66 between Rosslyn and the Capital Beltway. . .," in derogation of the Coleman Decision. Act of Oct. 9, 1999, Pub. L. 106-69, § 357(a), 113 Stat. 986, 1027. This exception to the Coleman Decision plainly included decisions like the Spot Improvement Project at issue in this action.

In 2003, United States Congressmen Frank Wolf and Tom Davis requested Virginia Governor Mark Warner to address five elements of I-66 that needed improvement: "[1] Ease congestion on I-66 westbound; [2] Reduce congestion on parallel local roadways; [3] Improve access to regional activity centers; [4] Improve economic vitality of activity centers; and [5] Provide quicker emergency evacuations from Washington, D.C." Virginia undertook the I-66 Inside the Beltway Feasibility Study (the Feasibility Study) to identify operational changes and any appropriate additional construction to address those issues. Thirty-eight concepts were

evaluated under broad categories of no-build, high occupancy vehicle/high occupancy toll lanes (HOV/HOT), transit, and roadway widening concepts. Those concepts specifically included the possibility of spot improvements, such as the lengthening of acceleration and deceleration lanes at interchanges to help minimize merge and weave conflicts by better balancing lane movements.

VDOT and FHWA sought public input and provided extensive opportunities to hear the public's views. VDOT held numerous stakeholder meetings, briefed community, civic, and business members about the findings, solicited additional comments, and reviewed the 218 comments it received. Some public comments advocated for spot improvements, and it was evident to those involved in the process that the interim measures contemplated by the Feasability Study included spot improvements.

In its Recommended Actions section, the Feasibility Study recommended two parallel courses for VDOT to follow. First, it identified "[t]he concept that was demonstrated to be the most responsive to the needs contained in the study's problem statement was actually a combination of Roadway Widening with a new managed lane. . . for HOV, HOT lanes, and/or express buses." Second, it concluded that "interim improvements that can occur with minimal impact are also recommended for evaluation to address spot problems and geometric deficiencies," and it

provided some examples of those interim improvements that included, among other things, improvements to existing signs, "optimization of signalization of parallel routes," and "provision of a continuous 12-foot shoulder. . . [for] emergency evacuation." Ultimately, the Feasibility Study identified that "[a]dditional studies will need to be conducted to further define the concepts."

Based on the Feasibility Study's recommendations to implement interim improvements, VDOT identified potential spot improvements as the interim measurements with the most benefits. VDOT considered the Feasibility Study's recognition of the need for "additional operational modeling for I-66 westbound. . . so that potential improvements could be tested with more accurate traffic operational data." Therefore, it completed follow-on extensive modeling using VISSIM, "a particularly flexible simulation software," to "provide[] the additional detail to determine specific characteristics of the spot improvements and to prioritize which improvements would. . . provide the greatest operational benefits."

In September 2006, the VISSIM Study considered seven total configurations of four spot improvements that included the three that VDOT selected in this case, 1B, 2A, and 3. Respectively, these are three, short acceleration/deceleration auxiliary lanes: (1) a 1.5-mile acceleration/deceleration lane from the Fairfax

Drive on-ramp to the existing deceleration lane at the Sycamore Street off-ramp; (2) a 1.6-mile long acceleration/deceleration lane from the Sycamore Street/Washington Boulevard on-ramp to the existing Dulles Airport Access Road off-ramp, and (3) a 0.9-mile acceleration lane from the Lee Highway/Spout-Run on-ramp to the existing deceleration lane at Glebe Road. The VISSIM modeling demonstrated that several of the improvements would be effective in relieving spot congestion in the I-66 westbound direction but that these three improvements are recommended for continued design and implementation based on their overall effectiveness. With this recommendation, VDOT sought approval from FHWA, and completed the CE.

Upon consideration of the effects of the Spot Improvement Project, FHWA concluded that it was appropriate for a CE under 23 C.F.R. § 771.117(d), as a "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g. parking, weaving, turning, climbing)." FHWA concluded that the three spot improvements had logical termini because the proposed acceleration/deceleration lane extensions/additions tie into existing I-66 on- and off-ramps lanes. FHWA relied on the Feasibility Study and the VISSIM Study to establish independent utility because those studies showed that the spot improvements would provide operational and other benefits for the I-66

7

westbound corridor as a whole and individually.

In determining whether the Project would cause any "[s]ignificant environmental impacts" under 23 C.F.R. § 771.117(b)(1), FHWA found no environmental impacts from the Project. It found no socio-economic impact because "all [of the] project would take place within the existing I-66 right of way," and the spot improvements would mitigate traffic congestion and improve access for community service vehicles. The Project will not use any park, recreation land, waterfowl/wildlife refuges, agricultural, open space easements, farmland, or historic properties because the work was in the right-of-way. VDOT found no threatened or endangered species or water resources nearby, so the Project would not impact them. Although VDOT concluded that invasive species may be present, it intended to minimize soil disturbances to inhibit those plants from establishing themselves. The Project involved no right-of-way acquisition and no relocation impacts. Because of traffic, FHWA requested VDOT analyze air quality impacts.

On October 15, 2007, Ron Carlee, County Manager for Arlington County, sent a letter to VDOT asking for various clarifications about the Project. FHWA and VDOT addressed each of these items during the CE process, and they found no significant environmental impacts and identified nothing that suggested any unexpected consequences.

On January 23, 2007, VDOT Conducted a Public Workshop in
Arlington to solicit the community's thoughts and ideas about
possible interim spot improvements.  Approximately 200 people
attended the workshop and comments were gathered through comment
cards and sheets.  On September 26, 2007, VDOT conducted a
second, Citizen Information Meeting in Arlington regarding
preliminary design of the Spot Improvement Project.
Approximately 150 people attended the meeting and had the
opportunity to view study exhibits, receive handouts, participate
in a public question and answer session, and provide comments to
a stenographer.  All comments were considered by the Chief
Engineer in completing the preliminary designs of the three spot
improvements.  VDOT incorporated these comments into its
decisions.

In response to traffic concerns, VDOT took measures to
address the issue on westbound I-66 through the Spot Improvement
Project.  Defendants argue the three spot improvements chosen
will increase traffic speed, reduce speed variability, and
decrease congestion.  They believe it will make I-66 safer by,
among other things, lengthening weave and merge areas, decreasing
speed fluctuation, and reducing travel time for emergency
responders.

The standard of judicial review for compliance with the
National Environmental Policy Act falls under the Administrative

Procedure Act, 5 U.S.C. § 706. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882-883 (1990); Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 186 (4th Cir. 1999). The role of the court "in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one," Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 555 (1978), and the APA requires the Court to uphold the agency's action unless the action was "arbitrary, capricious,. . . or otherwise not in accordance with law." 5 U.S.C. § 706. The court cannot substitute its judgment for that of the agency. Vt. Yankee, 435 U.S. at 519; Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 416 (1971); Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 288 (4th Cir. 1999). Rather, the court determines whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416.

The scope of judicial review is limited to the administrative record before the decision-maker at the time of its decision, and the administrative decision is entitled to a presumption of validity. Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973). In addressing a claim that an agency's action is unlawful, a reviewing court's task "is to apply the appropriate APA standard of review. . . to the agency decision based on the record the

agency presents to the reviewing court." Fla. Power, 470 U.S. at
743-44; see also Overton Park, 401 U.S. at 419.  Accordingly,
"[t]he reviewing court is not generally empowered to conduct a *de
novo* inquiry into the matter being reviewed and to reach its own
conclusions based on such an inquiry." Fla. Power, 470 U.S. at
744.

        Because claims brought under the APA are decided on the
basis of an existing administrative record such claims are
properly decided on summary judgment.  Under Rule 56(c) of the
Federal Rules of Civil Procedure, the Court must grant summary
judgment if the moving party demonstrates "that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  In reviewing a
motion for summary judgment, courts view the facts in a light
most favorable to the nonmoving party.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986).  Once a motion for summary
judgment is properly made and supported, the opposing party then
has the burden of showing that a genuine dispute as to any
material fact does exist.  Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The mere
existence of some alleged factual dispute between the parties
will not defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no genuine
issue of material fact.  Anderson, 477 U.S. at 248.  "Rule 56(e)

11

requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).

Congress enacted NEPA to establish a consistent process for federal agencies to consider the consequences of their actions upon the environment. <u>See</u> 42 U.S.C. §§ 4321-4370. NEPA also established the Council on Environmental Quality (CEQ). 42 U.S.C. §4342. In 1978, CEQ promulgated regulations governing federal agency compliance with NEPA. <u>See</u> 40 C.F.R. §§1500.1-1517.7. CEQ created "three typical classes" of actions that require different levels of analysis to satisfy NEPA:

    (i)    Which normally do not require environmental impact
           statements [EISs].
    (ii)   Which normally do not require either an environmental
           impact statement or an environmental assessment
           (Categorical Exclusions [CES] (Sec. 1508.4).
    (iii)  Which normally require environmental assessments [EAS]
           but not necessarily environmental impact statements.

40 C.F.R. § 1507.3(b)(2). <u>See also</u> 23 C.F.R. § 771.115 (describing three categories of actions for FHWA).

At the most detailed end of the spectrum of analysis, NEPA requires federal agencies to prepare a detailed "environmental impact statement" (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). An EIS must include a "detailed written

statement" concerning "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided;" it should inform the decision makers and the public of the reasonable alternatives that would minimize the adverse impacts or enhance the quality of the environment.  Id.; see also 40 C.F.R. §§ 1502.1, 1508.11.

The intermediate level of analysis is called an environmental assessment (EA).  These preliminary examinations of proposed actions allow an agency to determine whether NEPA requires it to prepare an EIS.  40 C.F.R. §§ 1501.4, 1508.9.  The EA "serves to. . . [b]riefly provide sufficient evidence and analysis" to determine whether the action will have a "significant" effect on the environment, the threshold for preparation of an EIS.  Section 1508.9.  If the agency determines that the effects will not be significant, it issues a "finding of no significant impact" (FONSI).  Id. at 1508.13.

At the lowest level of analysis, CEQ's regulations instruct agencies to identify classes of actions named "categorical exclusions," that normally "do not individually or cumulatively have a significant effect on the human environment" and are therefore excluded from the requirement of preparing an EA or an EIS.  Id. at §§ 1507.3(b)(2), 1508.4.  An agency's procedures for categorical exclusions must "provide for extraordinary circumstances in which a normally excluded action may have a

significant environmental effect," and require the agency to prepare an EA or EIS. <u>Id.</u> at § 1508.4. Thus, for each project that might fit a categorical exclusion, the agency must determine whether any extraordinary circumstances make the action's potential environmental effects significant.

Categorical exclusions are thus an integral part of the NEPA. In 1983, CEQ explained that using CEs avoids unnecessary documentation of minor environmental effects in EAs and allows agencies to focus their environmental review effort on the major actions that will have a significant effect on the environment and which are the primary focus of NEPA. <u>See</u> Rules and Regulations 48 Fed. Reg. 34,263-66 (July 28, 1983); <u>see also</u> 40 C.F.R. § 1500.4(p) (noting that establishing and using CEs can reduce excessive paperwork by eliminating unnecessary preparation of EAS). The CEQ has encouraged agencies to identify CEs using "broadly defined criteria which characterize types of actions that, based on the agency's experience," normally do not have "significant environmental effects." 48 Fed. Reg. at 34,265.

Plaintiffs argue that FHWA had to consider the effects of adding an additional lane to westbound I-66 because the Spot Improvement Project "was conceived as a single road project, but implemented piecemeal in order to circumvent environmental scrutiny and deflect political opposition." Plaintiffs' arguments, however, are not consistent with the facts and law.

14

NEPA regulations "prohibit an agency from avoiding the requirement of preparing an Environmental Impact Statement by breaking its proposed action down into small component parts in order to enable it to make a finding of no significant impact on each component." S.C. ex rel. Campbell v. O'Leary, 64 F.3d 892, 898 (4th Cir. 1995) (alterations omitted; quotations omitted) (quoting 40 C.F.R. § 1508.27(b)(7)). In this case, there is no pretextual segmentation and the Project has independent utility, ameliorating traffic on westbound I-66. Plaintiffs cite no record support or other evidence for their accusations that the agencies are trying to "circumvent environmental scrutiny and deflect political opposition." There is also no evidence to support a pretextual motive.

Plaintiffs allege VDOT "conceived" a project to widen the entire westbound route. However, the evidence shows that VDOT researched options, completed two studies, and considered the public comments to determine the best way to accomplish their overarching five objectives. After a lengthy process, VDOT did not choose to widen the entire road, but chose to implement interim spot improvements to mitigate the identified problems. Even assuming Plaintiffs' allegations were correct, and VDOT was pursuing the road widening, the result would not change. The Fourth Circuit has held that "the segmentation of one phase of a larger project prior to the completion of the environmental

review of the entire project constitutes impermissible segmentation only if the component action has a direct and substantial probability of influencing the agency's decision on the larger project." O'Leary, 64 F.3d at 898-99 (citing North Carolina v. City of Va. Beach, 951 F.2d 596 (4th Cir. 1992)). When considering logical termini, a court's "review is not to determine whether the defendants made the best choice, but only whether they made a choice that was informed and reasonable." Highway J. Citizens Group v. Mineta, 349 F.3d 938, 963 (7th Cir. 2003) (citing Save Barton Creek Ass'n v. FHWA, 950 F.2d 1129 (5th Cir. 1992)). Plaintiffs have not shown that the termini, the acceleration/deceleration lane extensions, are illogical.

The Spot Improvement Project provides multiple benefits of utility over the no-build option. It will increase average speed in both the morning and evening, reduce speed variability, reduce travel times in the morning and evening, and decrease congestion on various intersections, as well on I-66 itself. The Project will make I-66 safer, among other things, by lengthening weave and merge areas, decreasing speed fluctuation, improving level of service to reduce stop and go accidents, providing additional storage capacity for incidents on the mainline, and reducing travel time for emergency responders. These benefits will accrue regardless of whether VDOT implements the third-lane option, so the Project is not improperly segmented. See O'Reilly v. U.S.

16

Army Corps of Engineers, 477 F.3d 225, 237 (5th Cir. 2007)
(concluding that one phase of a project was not improperly
segmented because it "can stand alone without requiring
construction of the other two phases"). Contrary to Plaintiffs'
assertions, the VISSIM Study compares the spot improvements to
the no-build options, and it shows their effectiveness. The Spot
Improvement Project has independent utility from any other
hypothetical projects, and the agencies did not improperly
segment the project.

Plaintiffs argue that FHWA had to complete an EA instead of
a CE because Arlington County's opposition is "controversy on
environmental grounds" under 23 C.F.R. § 771.117(b) as an
"unusual circumstance []." Plaintiffs argue that the existence
of opposition creates controversy. However, the Fourth Circuit
"long ago rejected the suggestion that 'controversial' must
necessarily be equated with opposition. Otherwise, opposition,
and not the reasoned analysis set forth in an environmental
assessment, would determine whether an environmental impact
statement would have to be prepared. The outcome would be
governed by a 'heckler's veto.'" North Carolina v. FAA, 957 F.2d
1125, 1133-1134 (4th Cir. 1992) (quotations and citations
omitted) (applying 40 C.F.R. § 1508.27(b)(4) (1991)) (determining
significance of impact by, among other elements, "[t]he degree to
which the effects on the quality of the human environment are

likely to be highly controversial.")).

Arlington County's mere opposition, without more, does not create a controversy over environmental effects. The County's October 15, 2007 letter to VDOT asked for clarifications on six items: (1) water impacts from runoff, (2) any impacts on the Custis Trail bike route, (3) the effect on emergency responses, (4) traffic congestion at Glebe Road and Sycamore Street, (5) air-quality impacts of any increases in speed or volume of traffic on I-66, and (6) sound barriers to mitigate any noise impacts.

FHWA found that the Project would not impact any water resources because it was not in a floodplain, in a wetland, in a floodway zone, or near tidal waters. FHWA concluded that the Project would not use any portion of the Custis Trail, and it would actually improve access for community service vehicles such as emergency vehicles and buses. The VISSIM Study concluded that the Spot Improvements Project, specifically Spot Improvement #2, would improve intersection delays at Washington Boulevard, and the remaining spot improvement alternatives, including Spot Improvements ##1 and 3, would neither improve or worsen intersection delay at any location in the corridor, which include Glebe Road and Sycamore Street. VDOT studied the effects on air-quality and found that although it is possible that some localized areas may show an increase in emissions and ambient

levels of these pollutants due to locally increased traffic
levels associated with the proposed improvements, the Project
will not cause or contribute to a violation of national ambient
air quality standards, as established by the United States
Environmental Protection Agency.  Finally, VDOT's Noise Analysis
Technical Report found that "[a] substantial [noise] increase
impact is not expected to occur between 2006 existing noise
levels and 2032 build case noise levels anywhere within the study
corridor."

Through these analyses, FHWA and VDOT addressed each of
Arlington County's items through the CE Process.  They found no
substantial questions about the size, nature or effect of the
Spot Improvement Project.  The facts show clear answers to the
environmental concerns that Arlington County raised. Therefore,
there is no environmental controversy within the meaning of the
USDOT or NEPA regulations requiring preparation of an EA and
Plaintiffs are not entitled to relief.

Plaintiffs also argue that VDOT has to comply with the
Coleman Decision's restriction on road width to four lanes.   The
language of the Act of Oct. 9, 1999, Pub. L. 106-69, § 357(a),
113 Stat. 986, 1027, stated, "[n]otwithstanding the January 4,
1977, decision of the Secretary of Transportation," the plain
language of 357(a) "connote[d] a legislative intent to displace"
the Coleman Decision.   Shoshone Indian Tribe v. United States,

364 F.3d 1339, 1346 (Fed. Cir. 2004) (interpreting the phrase "notwithstanding any other provision of law" to abrogate a statute of limitations). Therefore, except for heavy truck restrictions in Section 357(b), the Coleman Decision simply does not restrict funding for VDOT to "operat[e], maint[ain], and construct[]. . . Interstate Route 66 between Rosslyn and the Capital Beltway. . . ." Section 357(a). Through the Spot Improvement Project, VDOT exercised its Congressionally-delegated authority to operate I-66 and further construct I-66. The Coleman Decision is therefore irrelevant to the Spot Improvement Project.

Even assuming Plaintiffs are right and the Coleman Decision does apply and limits federal funding for I-66 to only a "four-lane divided, limited access highway," it specifically excepted from that limitation "acceleration or deceleration lanes at interchange locations. . . ." These Spot Improvements fit that exception.

Plaintiffs also assert that the Spot Improvements constitutes a *de facto* extra lane. The Spot improvement Project would extend three acceleration/deceleration lanes on approximately 4 miles of the 9.6 miles between Rosslyn and the Beltway. Widening 42 percent of a distance is not *de facto* widening of the whole distance. Moreover, the acceleration/deceleration lanes terminate at interchanges, so

vehicles cannot move continuously through the corridor in the third lane.

Plaintiffs also argue that the Appropriations Act of Oct. 9, 1999, Pub. L. 106-69, § 357(a), is unconstitutional because "it encroaches on the prerogatives of both the executive and judicial branches." The exercise of judicial power under Article III of the Constitution depends on the existence of a case or controversy. "A federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." Preiser v. Newkirk, 422 U.S. 395, 401 (1975). Even if this Court were to decide that Section 357(a) is unconstitutional and the Coleman Decision retains its full effect, there is no effective relief. Plaintiffs have not raised a justiciable claim because the Coleman Decision does not apply to acceleration and deceleration lanes, therefore no relief can be granted.

The Plaintiffs further argue that under the ruling of Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995), this Court should find Congress overstepped its authority in enacting Section 357. Even assuming Plaintiffs have identified a case or controversy, Plaut does not apply because the case applies only to suits for money damages. However, in Plyer v. Moore, the Fourth Circuit distinguished Plaut, holding that "a judgment at law is immune to subsequent changes in the law. . . . A judgment providing for

injunctive relief, however, remains subject to subsequent changes in the law." 100 F.3d 365, 371 (4th Cir. 1996); cf. Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 183 (3rd Cir. 1999) (holding that, although Congress may not "revers[e] final judgments in a suit for money damages. . . . this rule does not apply to legislation that merely 'alters the prospective effect of injunctions entered by Article III courts." (quoting Plaut)). The APA applies only to "action[s] in a court of the United States seeking relief other than money damages. . . ." 5 U.S.C. § 702. Therefore, as an action under the APA, the D.C. Federation decision was not, and could not, have been a judgment at law for money damages; instead, it was a denial of a request for injunctive relief. 571 F.2d 1310. That opinion did not freeze the Coleman Decision in time forever regardless of any Congressionally-recognized changed circumstances over the next thirty years. Plaut does not prohibit Section 357(a) from altering the effect of the Coleman Decision.

Plaintiffs argue that Plaut stands for the proposition that Congress cannot "reopen . . . settled cases." Even assuming this is true, Congress did not reopen any adjudicated case by passing Section 357(a). In Plaut, the Supreme Court stated that, "[w]hen retroactive legislation requires its own application in a case already finally adjudicated, it does no more and no less than reverse a determination once made, in a particular case. . . .

22

[S]uch an act exceeds the powers of Congress." Plaut, 514 U.S. at 225. In D.C. Federation, the Fourth Circuit concluded that the Coleman Decision and the supplemental EIS complied with NEPA, Section 4(f), 49 U.S.C. § 1653(f) (1977). Section 357(a) did not reopen the D.C. Federation decision by overturning any of those judicial conclusions. Instead, Section 357(a) set aside the Coleman Decision itself. Therefore, by its own terms, Plaut does not apply and Congress did not exceed its bounds in enacting Section 357(a).

Plaintiffs further argue that "Section 357(a) abrogates an executive branch decision specifying the particular manner in which the I-66 controversy was to be resolved and curtails its authority to act prospectively as well." Plaintiffs are incorrect. Section 357(a) does not impinge on the Executive Branch's prerogative to issue new executive orders or new decisions. Congress retains plenary power to make exceptions to its own laws. Generally, the Secretary has authority to "preserve and enhance the Interstate System to meet the needs of the 21st Century." 23 U.S.C. § 101(b)(3)(H). Therefore, "[s]ubject to approval by the Secretary, funds apportioned to a State. . . for the National Highway System may be obligated for any of the following: (A) Construction, reconstruction, resurfacing, restoration, and rehabilitation of segments of the National Highway System. . . ." 23 U.S.C. § 103(b)(6).

23

Under that delegated authority, Secretary Coleman approved the VDOT application for Federal-aid highway fund participation subject to restrictions that include, among others, "[n]ot construct[ing] any highway lanes in the I-66 right-of-way beyond the four which I am now approving;. . . ." AR 2337, 44-45. As long as that decision was in effect, Section 103(b)(6) prevented VDOT from using Federal-aid highway money to modify I-66 unless it followed those restrictions. Through Section 357(a), Congress exercised its spending power and altered its delegation of authority to the Secretary to free the money. That act was within its sphere of authority and did not encroach on the Executive Branch's prerogatives. Therefore, because Congress was making exceptions to its delegation of its spending authority, it was acting consistent with its authority under the Constitution to amend its laws.

Plaintiffs also argue that FHWA and VDOT violated Federal and State noise abatement requirements because they calculated an unrealistic noise barrier cost/benefit property index and because they failed to consider the views of impacted residents. These arguments do not have merit. The noise barrier decisions do not affect Plaintiffs, therefore they lack standing to challenge the noise abatement measures. To establish standing, Plaintiffs "bear[] the burden of showing that [they have] standing for each type of relief sought." Summers v. Earth Island Institute, 129

24

S. Ct. 1142, 1149 (2009). A Plaintiff must show that he is under threat of suffering injury in the fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. Id.; see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "A plaintiff cannot show injury in fact by simply pointing to an agency's failure to follow a federal procedural statute." S.C. Wildlife Fed'n v. S.C. DOT, 485 F. Supp. 2d 661, 669 (D.S.C. 2007). Instead, Plaintiffs must show more than "an injury to a cognizable interest," and that they are "among the injured." Lujan, 504 U.S. at 564. It is also not enough for plaintiffs to show that they have an interest "in the vicinity" or "in the same area" at issue. See, e.g., Sierra Club v. Morton, 405 U.S. 727, 735 (1972).

In this case, Plaintiffs have not alleged, nor established, that they will experience a traffic noise impact as a result of the Spot Improvement Project. Although Plaintiff Reeder and Plaintiff Clement claim in their standing declarations that they will experience construction noise impacts, they do not allege that the predicted traffic noise levels will affect them. Plaintiff Ruebner alleges no noise injury at all. Furthermore, the administrative record demonstrates that the Plaintiffs will

not experience traffic noise impacts. Plaintiff Clement's
residence is located between noise prediction sites #598 and
#599, which shows a traffic noise level of 59 dB in year 2032.
Plaintiff Ruebner's residence is located behind noise barrier #23
and is nearest to noise prediction sites #637 and #643, which
show traffic noise levels of 56 and 54 dB, respectively, in year
2032. These noise levels are well below the NAC. Plaintiff
Reeder's residence is located approximately one mile north of I-
66, which is outside the range of impact. Plaintiffs argument
concerning traffic noise impacts and abatement measures involve
residents who are not a party to this action. Plaintiffs may not
premise their standing upon alleged injuries to non-parties.
Warth v. Seldin, 422 U.S. 490, 499 (1975) ("[t]he plaintiff
generally must assert his own legal rights and interests, and
cannot rest his claim to relief on the legal rights or interests
of third parties.").

Even assuming Plaintiffs had standing, the cost/benefit
property index is reasonable and Defendants appropriately
considered the views of impacted residents in determining which
abatement measures to implement. To satisfy its obligations, an
agency need only "cogently explain why it has exercised its
discretion in a given manner. . . ." Motor Vehicle Mfrs. Ass'n
v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48 (1983).

When an agency predicts a proposed project will cause a

noise level to approach or to exceed the noise abatement criteria (NAC) during the loudest hour of the day or when a predicted traffic noise level substantially exceeds the existing level, FHWA considers that project to have caused a traffic noise impact even if the predicted levels do not exceed the NAC. 23 C.F.R. § 772.5(g). Noise abatement measures, such as the construction of noise barriers, should be feasible and reasonable. 23 C.F.R. § 772.11(e)(1). To be feasible, a barrier must be effective, meaning, it must reduce noise levels by at least 5 decibels. To be reasonable, a barrier cannot cost more than $30,000 per protected or benefitted residential property. The applicable NAC for the Spot Improvement Project area is 67 decibels (dBA), so a noise impact occurs when future levels equal or exceed 66 dBA (within 1 dBA of the NAC) or when predicted levels exceed existing levels by 10 dBA or more. 23 C.F.R. § 772.5(g). The noise analysis technical report (NATR) identified locations in the Spot Improvement Project area that would experience noise impacts in the year 2032 under the build scenario.

VDOT declined to construct Barrier 21 for a number of reasons. Westover Park includes a soccer field, basketball court, volleyball court, ballfield, and playground. So the lowered noise would not benefit the park. In addition, if VDOT had constructed Barrier 21, it would have had to move the multi-purpose trail, there would have to be a barrier to accommodate

27

the pedestrian bridge, and the total cost would be $1,243,620. Barrier 31 would have provided noise protection to portions of Clarenford Station Park, but by year 2032, the dBA will reach 67 without the Project, but will remain 66 if the agency builds the spot improvements. Finally, for the basketball court and tennis court at Hayes park, VDOT expected two- and three-dBA increases, respectively, over the no-build, and these conclusions are consistent with VDOT's policy that a reasonableness determination is based on the cost, severity of impact (both in terms of noise levels and the size of the impacted area and the activity it contains), and the amount of noise reduction.

Plaintiffs argue VDOT used the wrong metric to determine whether to build noise barriers next to parks. As stated before, to be reasonable, a barrier cannot cost more than $30,000 per protected or benefitted property. The costs for barriers vastly exceeded the $30,000 per property costs that VDOT had considered reasonable, so it declined to build them. Barrier 21 would cost $82,908 per property, Barrier 31 would cost $84,825 per property, and Barrier 36 would cost $98,640 per property.

VDOT assessed potential traffic noise impacts in the project area, and, when the predicted noise level came within one dBA of, or exceeded the NAC, it considered whether abatement measures, such as noise barriers, were both feasible and reasonable. VDOT made reasonable conclusions in assessing all abatement measures.

Plaintiffs have not established that the lowered noise level
would have benefitted those parks full of soccer players and
playgrounds. "Deference is due where the agency has examined the
relevant data and provided an explanation of it s decision that
includes a rational connection between the facts found and the
choice made." Ohio Valley Envtl. Coal. V. Aracoma Coal Co., 556
F.3d 177, 192 (4th Cir. 2009) (quoting Motor Vehicle). Because
VDOT provided a cogent explanation for declining to build those
barriers, its decision is neither arbitrary nor capricious, and
has satisfied the APA.

Plaintiffs lastly allege that FHWA and VDOT unreasonably
failed to consider the views of impacted residents in determining
appropriate noise abatement measures and the reasonableness of
constructing or extending certain barriers. However, the
administrative record demonstrates that the Federal Defendants
and VDOT considered the views of all impacted residents who
submitted comments, including the specific individuals cited by
Plaintiffs, in determining the reasonableness of the noise
barriers in question. The project team appropriately considered
the public's comments on noise impacts and abatement measures, it
incorporated responses into the NATR, and the agencies came to
the rational conclusions based on the facts found. The agencies
analyzed the traffic noise near these residences and compared the
benefits of the barriers to their costs. Therefore, the agencies

decisions were not arbitrary or capricious.

Plaintiffs argue that 23 U.S.C. § 128(a) and 23 C.F.R. § 771.111(h) required Defendants to hold a public hearing on the Project, and that the public workshops and informational meetings held failed to comply with federal requirements. However VDOT conducted a public workshop on January 23, 2007, and a public information meeting on September 26, 2007, when it was under no requirement to do so.

When a state's proposed project "involv[es] the bypassing of, or going through, any city, town, or village," the Federal Aid Highways Act (FAHA) requires the state to certify that "it has had public hearings or afforded the opportunity for such hearings." 23 U.S.C. § 128(a). FHWA's regulations implementing Section 128 requires "[o]ne or more public hearings. . . to be held by the State highway agency. . . for any Federal-aid project which requires significant amounts of right-of-way, substantial adverse impact on abutting property, otherwise has a significant social economic, environmental or other effect, or for which FHWA determines that a public hearing is in the public interest." 23 C.F.R. § 771.111(h)(2)(iii).

The public hearing requirement does not apply to the Spot Improvement Project because the effects are insignificant. The Project does not change the right-of-way, substantially change the layout or functions of connecting roadways or of the facility

being improved, have a substantial adverse impact on abutting property, or have significant social, economic, environmental or other effects. The Spot Improvement Project does not involve the construction of a roadway bypassing or going through any city, town, or village.

By definition, CEs cause no significant impact, so no public hearing was required. Even assuming a public hearing was necessary for CEs, VDOT satisfied that requirement in the January 2007 public workshop and the September 2007 public information meeting. Attendees of this meeting were provided information about the Project and the opportunity to view numerous maps and exhibits and to speak with project and VDOT staff. Attendees were given meeting handouts, which included a project brochure, newsletter, contract sheet, and comment sheet. Nothing in the plain text of the governing statute and regulation rules out open houses as conforming with the public hearing requirement, therefore, even if Defendants were required, they satisfied the public meeting requirements in Section 771.111.

For the reasons stated above, Plaintiffs' Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

An appropriate Order shall issue.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia
April 30 , 2010